**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

|  |  |  |
|---|---|---|
| ADAM SALM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| PAMELA BONDI, ATTORNEY | ) | JURY TRIAL DEMANDED |
| GENERAL, U.S. DEPARTMENT OF | ) | |
| JUSTICE, AGENCY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

Plaintiff Adam Salm ("Plaintiff"), by and through his attorneys, CLARK HILL PLC, complaining of Defendants Pamela Bondi, Attorney General, United States Department of Justice ("DOJ") and the Drug Enforcement Administration ("DEA") (collectively, "Defendants"), alleges upon personal knowledge, unless where information and belief is stated, the following:

1.     This is an action brought for substantial compensatory damages and reasonable counsel fees premised upon the Defendants' acts of unlawful discrimination, harassment, and retaliation based on Plaintiff's disability, in violation of the Americans with Disabilities Act of 1990 (ADA) 42 U.S.C. § 12101, et seq., 42 U.S.C. § 2000e-5; and, the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301, et seq.

## JURISDICTION AND VENUE

2.     This court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1337 and 42 U.S.C. §§ 2000-e5(f)(1), 5(f)(3) and supplemental jurisdiction over the State law claims pursuant to 28 U.S.C. § 1367.

3.    As the Eastern District is the district where a substantial part of the events giving rise to the claims occurred and is the principal residence of defendant DEA, venue is proper within this district pursuant to 28 U.S.C. § 1391 (b)(1) and (2).

4.    Plaintiff filed a charge with the EEOC against Defendants on October 17, 2019 complaining of discrimination on the basis of his documented disability, as alleged in this complaint.

5.    On March 12, 2025, the EEOC issued a decision on the Appeal of the Agency's November 4, 2022, Final Order Concerning Plaintiff's EEO Complaint Alleging Employment Discrimination in Violation of Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791, *et seq*.

## THE PARTIES

6.    Plaintiff is a male with disabilities residing in the State of Virginia. Plaintiff has been diagnosed with physical disabilities connected with orthopedic injuries. Plaintiff is a "person" within the meaning of Executive Law § 292(1). Plaintiff's disabilities can impair many of his major life functions.

7.    Defendant Pamela Bondi is the United States Attorney General.

8.    Defendant Department of Justice ("DOJ") is a Federal Government Agency overseen by the Attorney General.

9.    Defendant DEA is an employer within the meaning of Executive Law § 292(5) and a sub agency of the DOJ.

10.    At all relevant times herein, Plaintiff was an applicant for employment by the Defendant DEA.

## FACTS

11.     On October 25, 2018, the Department of Veterans Affairs established that Mr. Salm has a combined 60% service-connected disability

12.     Mr. Salm's disability includes painful motion of the shoulder post right clavicle repair and thoracolumbar strain. Additionally, Mr. Salm suffers from tinnitus in his lower back and sinusitis. Because of his disabilities, Mr. Salm suffers from fluctuating levels of chronic pain.

13.     On or around June 2019, Mr. Salm received an initial medical physical at the DEA headquarters before being hired as a BAT at the Agency. During the physical, Mr. Salm disclosed that he had military service-related injuries that cause lower back pain

14.     On July 22, 2019, Mr. Salm received a final offer letter from the Agency to join the Drug Enforcement Administration ("DEA") as a Basic Agent Trainee ("BAT") in class # 221.

15.     On July 27, 2019, Mr. Salm passed the applicant PTT (Pre-Academy PTT). Again, on July 19, 2019, Mr. Salm passed the PTT which allowed him to join the DEA Academy.

16.     On August 18, 2019, Mr. Salm began the Basic Agent Training Class in Quantico, VA.

17.     To successfully graduate from the DEA Basic Agent Training Program, all BATs are required to pass the Physical Training Test ("PTT" or "PTA"). The PTT includes four events: sit-ups, a 300-meter sprint, push-ups and a 1.5-mile run. Id. A BAT "must attain a minimum of 12 points overall and at least one point in each of the four (4) events to achieve a minimum passing score.

18.     If a BAT fails the PTT, "he/she will be provided a written counseling notification of the failure, remediated, and retested withing five (5) working days." If the BAT passes the re-test, they will be allowed to proceed with the Basic Agent Training Program as scheduled. If the

BAT fails the second PTT, they will have accumulated two failures, is "deemed unprepared for training," and is dismissed to his/her office of hire.

19.    A BAT who is returned to his/her office of hiring is considered to be "recycled" for performance deficiencies and can attempt the PTT with a subsequent BAT class within 30 - 45 days. Conversely, if a BAT "sustains an injury or illness which precludes him/her from participating in required training beyond the maximum number of absences...the BAT may be guaranteed for medical recycle." A BAT who is medically recycled is not considered recycled for "performance issues" and can return with a subsequent training class to take the PTT without accruing additional failed PTTs.

10.    Mr. Salm disclosed his disability with DEA Medical and Human Resources on multiple occasions, providing them medical documentation during the hiring process and while at the DEA Academy. These disclosures include:

a.    On May 31, 2019, Mr. Salm disclosed his history of lower back pain to Dr. Narayan during his Medical History and Examination. Dr. Narayan made a notation about Mr. Salm's back pain in his medical chart, stating "40% Military/ Veterans Affairs Disability for Sinusitis, Tinnitus, and Lower Back."

b.    On June 12, 2019, before joining DEA, the Agency sent a "Physical Capabilities" form to Mr. Salm's physician from the Agency based on the medical information Mr. Salm disclosed to DEA. Mr. Salm's physician cleared Mr. Salm for duty, but noted his diagnosis of mild lumbar osteoarthritis, which includes symptoms of lower back pain.

c.    On August 19, 2019, Mr. Salm experienced neck pain and sought medical attention from the DEA health unit. Mr. Salm disclosed to Dr. Puneet Narayan that he was a disabled veteran.

d.  On August 20, 2019, Mr. Salm informed Athletic Trainer ("AT") Jessica Williams about his lower back issues and that he received VA benefits for his disability.

e.  On August 21, 2019, Mr. Salm informed Dr. Kiselica that he had a history of lower back pain.

f.  Mr. Salm submitted his VA Disability Letter to the Agency.

g.  Mr. Salm's resume, which the Agency had a copy of, referenced his disability status. On December 20, 2019, Ms. Gearhart-Marshall reviewed Mr. Salm's application for alternative positions at DEA, which stated that Mr. Salm received compensation from the Department of Veterans Affairs for having service-connected disabilities.

h.  Dr. Dania Kiselica acknowledged that there was a notation in Mr. Salm's medical record of his disability.

20.     On August 19, 2019, Mr. Salm was seen by Dr. Puneet Narayan. Mr. Salm informed Dr. Narayan that he had "lower back — lower neck, upper back pain with tingling in left upper extremity" and that he experienced similar symptoms in January 2019. Dr. Narayan noticed that Mr. Salm could only move his neck 20 degrees to the left and to the right. Dr. Narayan instructed Mr. Salm to get an x-ray at the Washington, D.C. Veterans Affairs Medical Center. Dr. Narayan instructed Mr. Salm to come back the following day if he was still in pain. Mr. Salm reported symptoms of neck and back pain before taking the PTT on August 20, 2019

21.     On August 20, 2019, Mr. Salm took the PTT, despite severe pain, and failed.

22.     On August 20, 2019, after the initial PTT, Mr. Salm sought medical care from the athletic trainer, Ms. Jessica Williams. According to Ms. William's medical notes, Mr. Salm reported "pain in his neck" which "begins up in the back of his head across his shoulders" and he felt "some pain down in his lower back." During this meeting, Mr. Salm also informed Ms. Williams that he has

a history of lower back issues and receives disability benefits from the military because of it. Ms. Williams diagnosed Mr. Salm with a trapezius spasm.

23.    On August 21, 2019, Mr. Salm was experiencing worsening pain, including breathing problems, and again sought medical care from Ms. Williams in the morning. Ms. Williams instructed Mr. Salm to do stretching exercises, which did not reduce his pain levels. Ms. Williams also referred Mr. Salm to Dr. Kiselica because of concerns with his breathing

24.    On August 21, 2019, later in the afternoon, Mr. Salm sought medical attention from Dr. Kiselica and informed her that his pain was "so intense that [he] didn't feel capable of exercising." Dr. Kiselica prescribed Mr. Salm ibuprofen and cleared him for duty. Mr. Salm also requested x-rays, which Dr. Kiselica believed were not necessary

25.    During the August 21, 2019, appointment with Dr. Kiselica, Mr. Salm requested a medical recycle. In response, Dr. Kiselica told Mr. Salm "No. Doing a medical recycle is a difficult process to do."

26.    On August 21, 2019, after meeting with Mr. Salm, Dr. Kiselica emailed Ms. Deborah Lary, Chief of Health Unit, and Ms. Victoria Wilds, stating that Mr. Salm "failed the initial PT test yesterday and seems to be ramping up symptoms ahead of retaking the PT test in two days, perhaps in an effort to get medically recycled before the retest." Dr. Kiselica further stated, "what concerns me is that there is a possibility that he may try to obtain a medical recycle so that he does not have to take the PTT again."

27.    Mr. Salm previously completed the PTT with no issues and sought a medical recycle so he could delay taking the PTT without jeopardizing his health. A medical recycle allows a BAT to leave the Academy to heal, before returning to the Academy in a new class of BATs. Medical recycles prevent an initial PTT failure from damaging the record of the BAT.

28. After treating Mr. Salm on August 21, Dr. Kiselica emailed DEA Health Unit officials accusing Mr. Salm of being a "very difficult historian," a phrase which Dr. Kiselica attributed to Mr. Salm "asking questions that are not typical of a student on day 3 of the academy" or being potentially "scatterbrained" and not disclosing prior medical conditions clearly.

29. On August 22, 2019, Mr. Salm was still experiencing worsening pain, reaching 8.5 out of 10 pain levels. Again, Mr. Salm received athletic training from Ms. Williams in the morning and saw Dr. Kiselica in the afternoon. When Mr. Salm inquired about receiving a medical recycle and stated that he was trying to prevent injuries, Dr. Kiselica stated that "this is a tough academy" and "people have taken the fitness test in worse condition that what [he was] in."

30. On the evening of August 22, 2019, Mr. Salm was still in pain, he informed SA Boleky that he was not feeling well and requested to go to urgent care. Mr. Salm got the impression that SA Boleky and his other class counselors did not believe him, and they asked him if he "really wanted to be there." Nonetheless, agents under Boleky's direction drove Mr. Salm to Patient First Urgent Care that night.

31. At Patient First, Mr. Salm received an x-ray of his chest and a physical examination. The provider at Patient First diagnosed Mr. Salm with back spasms, prescribed Prednisone and recommended a three-day restriction of physical activity. While both Patient First and the DEA Health Unit diagnosed Mr. Salm with muscle spasm, the provider at Patient First recommended that Mr. Salm avoid strenuous activities until August 26, 2019.

32. On August 23, 2019, Mr. Salm provided the evaluation from Patient First to Ms. Williams and Dr. Kiselica. When Mr. Salm gave Ms. Williams the doctor's note, she stated, "Dr. Kiselica can overturn this" and gave the impression that she did not believe Mr. Salm. Later that

day, Dr. Kiselica evaluated Mr. Salm right before the PTT re-test, noted that his symptoms were "unchanged," overturned the Patient First Evaluation, and cleared Mr. Salm for duty.

33.    On August 23, 2019, despite being cleared for the PTT re-test, Mr. Salm was still experiencing pain in his upper/mid back, neck, and shoulder blades, feelings of lightheadedness, blurred vision, coughing, chills, shortness of breath, tightness around his lateral posterior neck, and fatigue. Mr. Salm informed SA Bellomy and SA DeLeo that he was in pain.

34.    On August 23, 2019, despite knowledge of Mr. Salm's pain, Special Agents Bellomy and DeLeo instructed Mr. Salm to sign a release form which stated, "I have no injuries or illness that will prevent me from participating in the event or hinder my performance in the DEA PTA." When Mr. Salm inquired what would happen if he did not sign the form, Special Agents Bellomy and DeLeo told him "it probably wouldn't look good for [him] if he didn't sign the form or take the test." Thus, Mr. Salm felt like he would be fired or face some other reprimand that would have undercut his career if he did not sign the medical release form.

35.    On August 23, 2019, Mr. Salm was forced to take the PTT re-test, despite reporting his continuous severe pain, and failed.

36.    On August 23, 2019, after being forced to take the PTT for the second time, Mr. Salm went to the Washington, DC VA Medical Center because he was experiencing pain in his back, shoulder and neck reaching 9.5 out of 10 pain level. Mr. Salm was in so much pain that he felt lightheaded, dizzy, fatigued, and had trouble breathing and sleeping. The providers at the VA Medical Center diagnosed Mr. Salm with "myalgias post exercise" and gave Mr. Salm two shots of anti-inflammatory medicines Toradol and Solumedrol and prescribed Diazepam for three days. Mr. Salm received x-rays and MRIs and was instructed to "rest for one week." Mr. Salm's medical provider also recommended that he see a physical therapist.

8

37.     On August 26, 2019, Mr. Salm initially contacted the EEO Office to complain about being discriminated against on the basis of his disability when he was denied a medical accommodation and was required to take a physical fitness test (PTT) during training as part of the employment application process. Special Agent Tyrone Guyse, a superior manager to plaintiff, knew Mr. Salm felt he was treated unfairly by the DEA Health Unit and knew Mr. Salm contacted EEO on this date.

38.     From August 2019 through December 2019, Mr. Salm attended physical therapy for his back, arm, and neck pain.

39.     After failing the PTT on August 23, 2019, Mr. Salm returned to the DEA Washington District Office (WDO) as a PTA recycle.

40.     Mr. Salm was scheduled to re-take the PTT forty-five (45) days later on October 14, 2019. Pursuant to DEA policy DO 412, recycled BATs should take a PTT re-test between 30-45 days after a recycle.

41.     On September 13, 2019, Mr. Salm submitted a PTT Medical Delay Request Form, which requested to delay his scheduled PTT due to medical injury. Mr. Salm provided a medical evaluation which stated that he had a neck, upper back, and shoulder injury, for which he was receiving physical therapy treatment. Mr. Salm's request for medical delay was granted on September 24, 2019.

42.     Between August 23, 2019- January 31, 2020, Mr. Salm worked at the DEA Washington Division Office (WDO) while his physical condition improved and awaiting his PTT re¬test. While at DEA, Mr. Salm's first line supervisor was Mr. Tyrone Guyse and his second line supervisor was Jerome Sampson.

43.     While at the WDO, Mr. Salm provided information related to his health to Mr. Guyse, who then sent the information to the Health Unit. Mr. Salm was not given a direct contact within the Health Unit or at Headquarters.

44.     Because Mr. Salm was still experiencing physical pain while working at WDO, he sought reassignment to other vacant positions for which he was qualified while awaiting the final PTT re-test. Because Mr. Salm is a disabled veteran, he is eligible for military preference hiring at DEA.

45.     The Agency utilizes a veteran's preference system which gives certain hiring authority eligibility to veterans who either served in during a campaign or expedition, or that has an actual campaign or expeditionary medal. Determining whether a veteran is eligible for preference hiring also includes factors such as length of service, when the individual finished service, and the if the individual has service-related disabilities.

46.     Mr. Salm was eligible for non-competitive hiring authority because he was a "compensable veteran" that "could qualify for placement under a 30 percent or more disabled hiring authority". Thus, the Agency could place Mr. Salm in a "professional, administrative, or technical" position without competing with other candidates.

47.     Mr. Salm was interested and open to any position at DEA, stating "it didn't have to be a Special Agency position, in could be... an administrative position... an intel research specialist... one of the diversion investigators... or any other position I'd qualify for in DEA."

48.     From August 2019 through January 2020, Mr. Salm asked Mr. Guyse and Mr. Sampson about reassignment bi-weekly. Mr. Salm was not sure who he should talk to about receiving a new position at the agency, or whether he needed to apply to open positions on USAJOBS. Specifically, he requested a point of contact in the Human Resources Department.

However, neither Mr. Guyse nor Mr. Sampson provided Mr. Salm with an HR Contact until January 24, 2020.

49.      By October 4, 2019, Ms. Susan Gearhart-Marshall (Human Resources Specialist) was aware that Mr. Salm filed an EEO complaint.

50.      On October 17, 2019, Mr. Salm filed his original formal discrimination complaint.

51.      Despite Guyse stating he "is here to advocate for [Mr. Salm]," he did not provide Mr. Salm with a contact in HR until January 24, 2020.

52.      On November 1, 2019, Mr. Salm's doctor cleared him for physical activity.

53.      In December 2019, Special Agent ("SA") Tyrone Guyse informed Mr. Salm that he would be taking the PTA at Quantico, Virginia, instead of at Howard University, where other non-BATs took the PTA. Getting to Quantico required Mr. Salm to take public transit to the Washington District Office ("WDO") and then drive to Quantico with SA Sampson, which took over an hour. Mr. Salm then had to wait for the DEA Cadre to arrive at Quantico before the test could begin. The Howard University testing location, at the Benjamin Banneker Recreation Center, would have only been a 25-minute drive from Mr. Salm's home or a 10-minute drive from the WDO.

54.      SA Jerome Sampson drove Mr. Salm to Quantico for the PTT re-test and SA Tyrone Guyse met them there. Despite driving all the way to Quantico, SA Sampson and SA Guyse did not stay to watch Mr. Salm complete the PTT.

55.      Mr. Salm was the only individual taking the PTT at Quantico on December 16, 2019.

56.     On December 16, 2019, Mr. Saim took the PTT in Quantico, Virginia. On that day, the weather conditions were very cold and there was a snow and ice storm in the northern Virginia and DC area.

57.     When Mr. Salm arrived at Quantico to take the PTT, he noticed black ice on the track and the track felt slippery and icy. Because of the slippery and treacherous conditions on the track, Mr. Salm did not pass sprint portion of the PTT.

58.     After the December 16, 2019. PTA test attempt, Mr. Salm was not informed whether he could take a fourth PTA or if he would get another position in DEA. Mr. Salm asked both SA Guyse and SA Sampson about this and Mr. Salm was told to wait to hear what DEA Human Resources has to say about his case. Mr. Salm did not hear from DEA Human Resources until he spoke to Tangela McBride at Employee Relations on January 24, 2021.

59.     On December 20, 2019, Mr. Gearhart-Marshall, Human Resources Specialist, received a copy of Mr. Salm's resume, transcripts, DD214 and VA Preference Letter. Ms. Gearhart-Marshall was informed the Mr. Salm is a "CPS Vet and eligible for non-competitive placement/ hire."

60.     Ms. Gearhart Marshall, Human Resources Specialist, is responsible for reassigning BATs who fail the PTT. Ms. Gearhart-Marshall stated that "it was [her] understanding that Mr. Salm... only wanted consideration for a core-series position."

61.     A "core series" position includes the special agent, diversion investigator, forensic chemist, and intelligence research specialist positions.

62.     On or around September 13, 2019, Mr. Salm applied for an Intelligence Research Specialist ("IRS") vacancy (F-NC-19-10597718-DE-SG).

63.    On December 2, 2019, Mr. Michael Daly emailed Ms. Gearhart-Marshall to inquire whether Mr. Salm applied for the IRS F-NC-19-1 0597718-DE-SG position. On December 4, 2019, Ms. Gearhart-Marshall replied, stating that Mr. Salm did not meet the "bio-data assessment cut-off" and thus was not considered for the position. However, Mr. Salm was never notified that he did not meet the qualifying score for the IRS assessment.

64.    On January 7, 2020, Mr. Will Kimbell, former Section Chief, Special Agent Services Section, emailed Ms. Gearhart-Marshall "to try to identify placement options to a PATCO position" for Mr. Salm. Ms. Gearhart-Marshall stated that she typically considers dismissed BATs for PATCO positions but did not do so for Mr. Salm until requested by Mr. Kimbell to expand her search.

65.    Mr. Salm was flexible in whatever [position] they had. He was willing to work in security administration, intelligence research or even human resources if he needed to.

66.    After many requests, on or around January 24, 2020, SA Sampson gave Mr. Salm the contact information for Tangela McBride, a DEA Human Resources Specialist. When Mr. Salm asked Ms. McBride about a new position within DEA, Ms. McBride stated she did not know and that she only deals with disciplinary issues. Ms. McBride also told Mr. Salm that she could not put him in contact with anyone in HR, but his resume was being sent around.

67.    The Agency should have been able to make a reassignment happen easily because he was a CPS Vet, Compensively Disabled Vet, which would allow it to make a reassignment.

68.    Between December 2019- January 2020, Special Agent in Charge ("SAC") Jesse Fong, who issued Mr. Salm's termination letter thereby resulting in denial of employment with DEA, learned of Mr. Salm's EEO complaint before issuing the termination memo.

69.    On February 4, 2020, Mr. Salm amended his original formal complaint to include additional instances of discrimination based on his disability. See ROI 47.

70.    On January 31, 2020, the Agency terminated Mr. Salm. Special Agent in Charge Jesse Fong met with Mr. Salm and informed him that he was terminated. Mr. Salm requested to resign in lieu of termination because he was still waiting to hear about reassignment.

71.    On March 11, 2021, Mr. Salm took another PTT for a Special Agent position with DEA. There were six (6) total Agency employees, including SA Sampson, at the Benjamin Banneker Recreation Center Track to observe only four (4) individuals take the PTT. Typically, there are only four (4) Agency employees observing twenty (20) or more candidates take the PTT. Mr. Salm did not pass the PTT.

72.    On April 13, 2021, Mr. Salm took another PTT for a Special Agent position at DEA. Again, SA Sampson was present at the PTT and graded Mr. Salm's 300-meter sprint. Mr. Salm completed the sprint in 54.4 seconds, and a passing score would have been 52.4 seconds. Just three days prior, on April 10, 2021, Mr. Salm ran the 300-meter sprint in 49.8 seconds.

## FIRST CAUSE OF ACTION
### (Discrimination Based Upon Disability in Violation of the Americans with Disabilities Act ("ADA"))

73.    Plaintiff hereby repeats, re-alleges, and incorporates each and every allegation contained in the above paragraphs of this Complaint as though fully set forth in this paragraph of the Complaint.

74.    Defendants discriminated against Plaintiff on the basis of his disability in violation of the ADA, by treating him differently and by subjecting him to disparate conditions relating employment and other disparate terms and conditions.

75.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the ADA, Plaintiff has suffered and continues to suffer monetary and/or economic harm, including, but no limited to, denial of employment, loss of past and future income, compensation, and benefits, for which he is entitled to an award of monetary damages and other relief, including, but not limited to, attorneys' fees and expenses.

76.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the ADA, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress, anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which he is entitled to an award of compensatory and monetary damages and other relief.

77.     Defendants' discriminatory actions in violation of the ADA were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's civil rights.

78.     That by reason of the foregoing, Plaintiff suffered and continues to suffer irreparable injury and monetary damages as well as punitive damages, costs, and attorney's fees, and any other relief this Court may find just and proper.

## SECOND CAUSE OF ACTION
### (Hostile Work Environment against all Defendants)

79.     Plaintiff hereby repeats, re-alleges, and incorporates each and every allegation contained in the above paragraphs of this complaint as though fully set forth in this paragraph of the Complaint.

80.     Defendants created a hostile work environment for Plaintiff, when they created an objectively abusive work environment for Plaintiff, which altered the conditions of Plaintiff's employment, in an attempt to marginalize him within DEA.

81.     Furthermore, by reason of the continuous nature of Defendants' hostile and discriminatory treatment of Plaintiff, which persisted throughout the relevant period mentioned hereinabove, up to his termination, Plaintiff is entitled to the application of the continuing violations doctrine to all violations alleged herein as the actions of Defendants had a continuous adverse and prejudicial impact on Plaintiff.

82.     As a result of Defendants harassing conduct, Plaintiff has incurred, and will continue to incur, damages thereby, but no limited to back pay, forward pay, reduced pension benefits, and attorneys' fees.

83.     As a result of defendants' harassing conduct, Plaintiff has suffered and will continue to suffer mental anguish, emotional distress, and loss of enjoyment of life; and has incurred and will incur damages thereby.

### THIRD CAUSE OF ACTION
### (Retaliation – Pursuant to the ADA against All Defendants)

84.     Plaintiff hereby repeats, re-alleges, and incorporates each and every allegation contained in the above paragraphs of this Complaint as though fully set forth in this paragraph of the Complaint.

85.     Plaintiff was subjected to retaliation in that he was denied permanent employment and ultimately terminated as a direct result of his participation in a protected activity, specifically, filing an EEOC complaint.

86.     As a result of the Defendants' discriminatory and retaliatory conduct, Plaintiff has incurred and will continue to incur damages, including but not limited to lost income, reduced pension benefits, and legal fees.

87.     As a result of Defendants' discriminatory and retaliatory conduct, Plaintiff has suffered and will continue to suffer emotional distress and loss of quality of life.

### FOURTH CAUSE OF ACTION
### (Violation of the Americans with Disabilities Act, 42 U.S.C. 12112(a))

88.     Plaintiff hereby repeats, re-alleges, and incorporates each and every allegation contained in the above paragraphs of this Complaint as though fully set forth in this paragraph of the Complaint.

89.     The ADA prohibits discrimination on the basis of disability, among other things, "in regard to…other terms, conditions, and privileges of employment." 42 U.S.C. 12112(a).

90.     Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. 12112(b)(5)(A).

91.     When the defendants refused to provide reasonable accommodations in response to Plaintiff's employment application, they violated the ADA.

92.     The reasonable accommodations requested by Plaintiff did not impose an undue hardship on defendants.

93.     As a result of the Defendants' discriminatory and retaliatory conduct, Plaintiff has incurred and will continue to incur damages, including but not limited to lost income, reduced pension benefits, and legal fees.

94.     As a result of Defendants' discriminatory and retaliatory conduct, Plaintiff has suffered and will continue to suffer emotional distress and loss of quality of life.

### FIFTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress against All Defendants)

95.     Plaintiff hereby repeats, re-alleges, and incorporates each and every allegation contained in the above paragraphs of this Complaint as though fully set forth in this paragraph of the Complaint.

96.     The conduct of Defendants as alleged herein was intentionally targeted against Plaintiff, in his capacity as a member of a protected class (person with a disability). The conduct alleged herein, in the employment context, was beyond all possible bounds of decency, was atrocious, and is utterly intolerable in a civil society.

97.     As itemized in this Complaint above, the Defendants were on notice of Plaintiff's disabilities and his protected EEOC filings, yet terminated him without just cause. Rather than admonish or discipline the DEA Defendants for engaging in such intentional and retaliatory conduct, Defendants Bondi and DOJ implicitly ratified and encouraged Defendants to engage in such conduct, to the damage and detriment of Plaintiff. As a direct and causal result of this pattern of intentional and despicable harassment and intimidation by Defendants, Plaintiff has been damaged.

98.     The Defendants maliciously conspired together to undermine Plaintiff's employment and to otherwise diminish, denigrate, and defame Plaintiff in the workplace by publishing and disseminating false and misleading information, with the consent and acquiescence of Bondi and the DOJ.

99.     Plaintiff suffered severe trauma and emotional distress.

100.     Defendants' conduct actually and proximately caused Plaintiff's suffering.

101.    As a result of the acts of intentional emotional distress identified hereinabove, Defendants, and each of them, breached their duty to Plaintiff and Plaintiff is entitled, directly and proximately, to damages in an amount to be more specifically determined at the time of trial.

102.    As a result of the events transpiring during his employment process with the DEA as a senior military member with a disability, Plaintiff had no options since the DEA management deprived him of employment.

103.    Plaintiff has been required to retain the services of an attorney to pursue this action. And is entitled to recover attorney's fees and costs incurred.

## SIXTH CAUSE OF ACTION
### (Negligent Infliction of Emotional Distress Against All Defendants)

104.    Plaintiff hereby repeats, re-alleges, and incorporates each and every allegation contained in the above paragraphs of this Complaint as though fully set forth in this paragraph of the Complaint.

105.    As set forth herein, Defendants engaged in negligent conduct.

106.    Defendants' negligent conduct caused Plaintiff to suffer severe trauma and emotional distress.

107.    Plaintiff exhausted administrative avenues requesting DOJ to address his claims of stress and emotional injury.

108.    Defendants' conduct was the proximate cause of Plaintiff's severe trauma and emotional distress. As a result of the negligent infliction of emotional distress identified hereinabove, Plaintiff has been directly and proximately damaged in an amount to be more specifically determined.

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants, jointly and severally, awarding Plaintiff compensation and other damages in the form of back pay, front pay,

and other monies and benefits unlawfully denied to Plaintiff, as well as for emotional distress, permanent damages to Plaintiff's emotional/mental well-being, loss of enjoyment of life, including pain and suffering, shame and humiliation.

1.     On the First Cause of Action, judgment against Defendants or at least One Million Dollars ($1,000,000.00) in compensatory damages and attorneys' fees, in an exact amount to be determined at trial;

2.     On the Second Cause of Action, judgment against Defendants for at least One Million Dollars ($1,000,000.00) in compensatory damages and attorneys' fees, in an exact amount to be determined at trial;

3.     On the Third Cause of Action, judgment against Defendants for at least One Million Dollars ($1,000,000.00) in compensatory damages and attorneys' fees, in an exact amount to be determined at trial;

4.     On the Fourth Cause of Action, judgment against Defendants for at least One Million Dollars ($1,000,000.00) in compensatory damages and attorneys' fees, in an exact amount to be determined at trial;

5.     On the Fifth Cause of Action, judgment against Defendants for at least One Million Dollars ($1,000,000.00) in compensatory damages and attorneys' fees, in an exact amount to be determined at trial;

6.     On the Sixth Cause of Action, judgment against Defendants for at least One Million Dollars ($1,000,000.00) in compensatory damages and attorneys' fees, in an exact amount to be determined at trial; and

7.    That Plaintiff have such other, further, and different relief as the Court deem just, proper, and equitable in the circumstances, together with interest on all Causes of Action, attorney's fees, and costs and disbursements in this action.

## JURY DEMAND

Plaintiff hereby demands a trial by jury in this action.


Dated:  June 10, 2025                                    Respectfully submitted,

*/s/ Kraig D. Jennett*
Kraig D. Jennett, Esq. (VA Bar No. 93246)
Clark Hill PLC
1001 Pennsylvania Avenue, N.W.
Suite 1300 South
Washington DC  20004
Telephone:   (202) 772-0913
Facsimile:   (202) 772-0919
Email:         kjennett@clarkhill.com

*Counsel for Plaintiff Adam Salm*